```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
EURO-PRO OPERATING LLC d/b/a              :
EURO-PRO CORPORATION,                     :
                                          :
                      Plaintiff,          :   08CV6231 (HB)
                                          :   OPINION & ORDER
           -against-                      :
                                          :
EUROFLEX AMERICAS, EUROFLEX               :
SRL ITALY, ANDREA MILANESE                :
PIER ANTONIO MILANESE                     :
                                          :
                      Defendants.         :
-----------------------------------------------------------------x
```

**Hon. HAROLD BAER, JR., United States District Judge:**

Plaintiff Euro-Pro Operating LLC ("Euro-Pro") moves to preliminarily enjoin Defendants Euroflex Americas, et al. (collectively, "Euroflex") from making certain claims in their television "infomercials" that Euro-Pro alleges to be false, in violation of Section 43(a) of the Lanham Act (15 U.S.C. §§ 1051 *et seq.*) and Sections 349 and 350 of New York's General Business Law. Euroflex separately moves for an order dismissing individual Defendant Pier Antonio Milanese for lack of personal jurisdiction under Fed. R. Civ. Pro. 12(b)(2). For the following reasons Euro-Pro's motion for a preliminary injunction is granted in part and denied in part and Euroflex's motion to dismiss Defendant Pier Antonio Milanese is denied to permit discovery on the jurisdictional issue. Further, the parties are instructed to prepare for trial on an expedited schedule.

## FACTUAL BACKGROUND

The parties are competing manufacturers and marketers of portable handheld steam cleaning appliances. Euro-Pro manufactures and markets a line of steam cleaners that include, among others, the Euro-Pro Shark Steam Blaster and the Euro-Pro Steam Mop. Compl. ¶2. Euroflex manufactures and markets a hand-held, electric steam cleaner known as the Monster 1200 Sanitizing Steam Cleaner ("Monster 1200").[1] *Id.* at ¶5. Both parties'

---

[1] For ease of reference, the four named Defendants are collectively referred to herein as "Euroflex." Euroflex SRL is an Italian company that manufactures Euroflex products, including the Monster 1200, and markets and distributes them in Europe. Decl. of Pier Antonio Milanese, dated October 31, 2008 ("P. Milanese Decl.") ¶ 3. Euroflex Americas distributes, markets and advertises products manufactured by Euroflex SRL, in the United States. *Id.* at ¶ 4. Defendant Pier Antonio Milanese is the President and founder of Euroflex SRL. *Id. at* ¶ 1.

market their steam cleaners principally through direct response television infomercials and on the internet. Compl. ¶¶ 5-7; Decl. of Mark Rosenzweig, dated October 6, 2008 ("Mark Rosenzweig Decl.") ¶11.

Euroflex began marketing and selling the Monster 1200 in January 2008. Decl. of Stojan Dragovich, dated Sept. 29, 2008 ("Dragovich Decl.") ¶ 2. Unlike other steam cleaners, including Euro-Pro's Shark Steam Mop, which clean with steam only, the Monster 1200 allows users to combine steam with a disinfectant cleaning solution called "Clean Blast."[2] Decl. of Yigal Offir, dated September 12, 2008 ¶ 7. Euroflex claims that this "exclusive technology" makes the Monster 1200 more effective than "ordinary steamers." Second Decl. of Roger Colazzi, dated October 31, 2008 ("Second Colazzi Decl."), Ex. B, Tr. of Revised Euroflex Infomercial (hereinafter, "Infomercial") at 6.

Although Euroflex and Euro-Pro presently compete in direct marketing of portable household steam cleaners, Euroflex previously manufactured a steam cleaner for Euro-Pro under the "Shark" brand. Decl. of Max Rosenzweig, dated October 6, 2008 ("First Max Rosenszweig Decl.") ¶ 5. During the pendency of that business relationship Max Rosenzweig, a Euro-Pro Executive Vice President, traveled to Italy on more than one occasion, visiting the Euroflex factory and dining in the home of Defendant Pier Antonio Milanese. Decl. of Max Rosenzweig, dated November 17, 2008 ("Second Max Rosenszweig Decl.") ¶ 4. The business relationship ended with a dispute not at issue here. First Max Rosenzweig Decl. ¶¶ 7-13.

This action was filed on July 7, 2008 and the instant motion to for preliminary injunction was filed on September 25, 2008. Subsequent to the filing of the instant motion for preliminary injunction, Euroflex modified the Infomercial to, in its words, "focus this dispute on Euro-Pro's central challenges" by "eliminat[ing] or further explain[ing] certain other collateral, challenged claims."[3] Defs.' Opp'n. Mem. at 2 n. 2.

---

His son, Defendant Andrea Milanese is the Chief Executive Officer of Euroflex SRL and Chief Executive Officer of Euroflex Americas. Decl. of Andrea Milanese, dated September 29, 2008 ("A. Milanese Decl") ¶ 1.
[2] The disinfectant solution that Euroflex markets as "Clean Blast" is a sub-registered version of Vital Oxide, a substance registered with the U.S. EPA as a broad spectrum cleaning solution. Decl of Joseph V. Rodricks, dated November 17, 2008, Ex. A, 2 ("Rodericks Report"). The active ingredients in Clean Blast are chlorine dioxide (0.2%) and two forms of alkyl dimethyl benzl ammonium chlorides (0.125% each). Decl. of Mary Ellen R. Himes, dated September 15, 2008 ("Himes Decl."), Ex. E.
[3] The term "Infomercial" as used herein refers to the revised Infomercial, a copy of which has been delivered to the Court and a transcription of which is found attached to the Second Colazzi Decl. as Exhibit B.

Euro-Pro alleges that the Infomercial contains numerous false claims about the Monster 1200 that fall into four general categories: (1) the "EPA Tested and Approved Claims," such as "EPA tested and approved so you know it's safe;" (2) the "Efficacy Claims" or "Sanitizes on Contact Claims" such as "kills 99.99% of all germs and bacteria on contact" and "truly sanitizes on contact;" (3) the "Superiority Claims" such as "kills all the germs and bacteria that it comes in contact with, and regular steam just doesn't do that" and "this is the only one of its kind; it's the only one that can sanitize"; and (4) the "Safety Claims" such as claims the Monster 1200 is "completely safe" and "harmless."

In many cases the allegedly false claims are intertwined. For example, Efficacy Claims are often asserted in conjunction with a Superiority Claim (e.g. "you can truly sanitize your entire bathroom in 15 seconds – no other steam cleaner in the world can make that claim") and EPA Tested and Approved Claim are joined with Safety Claims (e.g "U.S. EPA tested and approved so you know it's safe."). For clarity, I analyze each category of allegedly false claims in turn.

## LEGAL STANDARDS

### A. Preliminary Injunction

A party seeking preliminary injunctive relief must establish: (1) either (a) a likelihood of success on the merits of its case or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in its favor, *and* (2) a likelihood of irreparable harm if the requested relief is denied. *Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 152-53 (2d Cir. 2007). Preliminary injunctive relief is an extraordinary and drastic remedy which should not be routinely granted. *Procter & Gamble Co. v. Ultreo, Inc*. 2008 WL 4104010, *3 (SDNY 2008). The decision to grant or deny injunctive relief "'rests in the sound discretion of the district court.'" *Reuters Ltd. v. United Press Int'l, Inc.,* 903 F.2d 904, 907 (2d Cir.1990) (quoting *Thornburgh v. Am. Coll. of Obstetricians and Gynecologists,* 476 U.S. 747, 755(1986)).

### B. Motion to Dismiss for Lack of Personal Jurisdiction

"The plaintiff bears the burden of establishing that the court has jurisdiction over the defendant when served with a Rule 12(b)(2) motion to dismiss." *Whitaker v. Am. Telecasting, Inc., 261 F.3d 196, 208* (2d Cir. 2001). But the plaintiff need only make a *prima facie* showing of jurisdiction when no evidentiary hearing has been held. *Hsin Ten Enter. USA,*

3

*Inc. v. Clark Enters.*, 138 F. Supp. 2d 449, 451 (S.D.N.Y. 2000).  The Court may rely on matters outside the pleadings and such documents are construed in the light most favorable to plaintiff and all doubts are resolved in its favor. *CutCo Industries, Inc. v. Naughton*, 806 F.2d 361, 365 (2d Cir. 1986).

## DISCUSSION

### A. Preliminary Injunction

#### 1. False Advertising Under the Lanham Act

Section 43(a)(1) of the Lanham Act provides that any person who, in connection with commercial advertising, uses a "false or misleading description of fact" which "(B) … misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities," shall be liable to any person damaged thereby.  15 U.S.C. §1125(a)(1).  A plaintiff who brings a false advertising claim under Section 43(a) of the Lanham Act may proceed under either (or both) of two theories of recovery.  *Time Warner*, 497 F. 3d at 153.

Under the first theory, the plaintiff must demonstrate that the advertisement at issue is literally false. "When an advertisement is shown to be literally or facially false, consumer deception is presumed, and 'the court may grant relief without reference to the advertisement's [actual] impact on the buying public.'" *Id.* (quoting *Coca-Cola Co. v. Tropicana Products, Inc.* 690 F.2d 312, 317 (2d Cir. 1982) *abrogated on other grounds by* Fed. R. Civ. P. 52(a).  Under the second theory of recovery, a plaintiff may show that an advertisement, though not literally false, is nevertheless likely to mislead or confuse consumers, in which case a district court must rely on extrinsic evidence of consumer deception or confusion. *Id.*

#### a. Literal Falsity

Plaintiff Euro-Pro proceeds upon a theory that Euroflex's advertising claims are literally false. To determine the literal falsity of the Infomercial's claims I must "construe and parse the language of the advertisement," but when a claim relies on innuendo or ambiguous suggestions, "the court's reaction is at best not determinative and at worst irrelevant"; in such circumstances, "the truth or falsity of the advertisement should be tested by reactions of the public," not the judge. *American Home Products Corp. v. Johnson and Johnson*, 577 F.2d 160, 165-66 (2d Cir. 1978).  On the other hand, the Second Circuit has counseled that I must

4

"heed the familiar warning of Judge Learned Hand that '[t]here is no surer way to misread any document than to read it literally,'" *Guiseppi v. Walling,* 144 F.2d 608, 624 (2d Cir.1944) (concurring opinion), and interpret the allegedly false statements in their context within the advertisements. *Avis Rent A Car System, Inc. v. Hertz Corp.*, 782 F.2d 381, 385 (2d Cir. 1986). These two directives are synthesized by the "false by necessary implication" doctrine, formally adopted by the Second Circuit in *Time Warner Cable*:

> a district court evaluating whether an advertisement is literally false "must analyze the message conveyed in full context," *i.e.,* it "must consider the advertisement in its entirety and not ... engage in disputatious dissection." If the words or images, considered in context, necessarily imply a false message, the advertisement is literally false . . . [but] if the language or graphic is susceptible to more than one reasonable interpretation, the advertisement cannot be literally false.

*Time Warner* Cable, 497 F.3d at 158 (internal citations omitted). Therefore, I must evaluate the advertising claims in the context of the Infomercial, but may not find them to be literally false unless they are unambiguously untrue.

### b. Establishment Claims

Whereas a plaintiff typically must adduce evidence that affirmatively shows that an advertising claim is literally false, its burden is somewhat different "when the challenged advertisement relies either implicitly or explicitly on scientific studies"—a so-called "establishment" or "tests-prove" claim. *Johnson & Johnson Vision Care, Inc. v. Ciba Vision Corp.*, 348 F.Supp.2d 165, 178 (SDNY 2004). In such cases a plaintiff meets its burden by showing that either the tests relied upon do not prove the proposition for which they are cited or that they are "not sufficiently reliable to permit one to conclude with reasonable certainty" that they prove that claim. *McNeil-P.C.C., Inc. v. Bristol-Myers Squibb Co.*, 938 F.2d 1544, 1549 (2d Cir 1991).

However, "[t]he mere fact that one party's evidence in support of the truth of its advertisements was unpersuasive would not *ipso facto* entitle the other party to relief." *Procter & Gamble Company v. Chesebrough-Ponds Inc.*, 747 F.2d 114, 119 (2d Cir. 1984); *see also, McNeil-P.C.C.*, 938 F.2d at 1549 (noting that the "sufficiently reliable" standard requires a plaintiff to "do more than show that the tests supporting the challenged claim are unpersuasive."). Thus, in *McNeil-P.C.C.* the Second Circuit affirmed the district court's grant of a permanent injunction because the plaintiff "did more than merely critique and expose the

methodological weaknesses of the [defendant's studies]" but rather "affirmatively demonstrated . . . [that] the only relevant and reliable scientific data . . . conclusively established" the falsity of the plaintiff's claim. *McNeil-P.C.C.*, 938 F.2d at 1549-50.

### c. Irreparable Harm

To show irreparable harm, Euro-Pro must show that it is likely that Euroflex's advertising has caused or will cause a loss of Euro-Pro sales, but it need not "come forward with specific evidence that [Euroflex's] ads actually resulted in some definite loss of sales." *Johnson & Johnson v. Carter-Wallace, Inc.*, 631 F.2d 186, 190 (2d Cir. 1980). Injury and causation may be presumed in the case of comparative advertisements that either mention the plaintiff or its product by name or make it obvious that the advertisement is aimed at the plaintiff. *Time Warner*, 497 F.3d at 144. Otherwise, to establish that diversion of sales from the allegedly false advertisements is likely, Euro-Pro must show: "(i) that the parties are competitors in the relevant market, and (ii) that there is a 'logical causal connection between the alleged false advertising and its own sales position.'" *Zeneca Inc. v. Eli Lilly and Co.*, 1999 WL 509471, *36 (S.D.N.Y. 1999) (quoting *Johnson & Johnson,* 631 F.2d at 190-91).

## 2. Analysis of Infomercial Claims

I now apply the foregoing principles to the allegedly false claims in the Infomercial, starting with the issue of irreparable harm and then turning to the likelihood of Euro-Pro's success on the merits.

### a. Irreparable Harm

Euro-Pro is entitled to a presumption of irreparable harm because the Infomercial is a comparative advertisement, even though it does not mention Euro-Pro or its "Shark" line of steam cleaners by name. Although the paradigmatic comparative advertisement mentions a competitor's product by name, the Second Circuit has acknowledged, "the fact that the commercial does not name the plaintiff's product is not necessarily dispositive." *Time Warner*, 497 F.3d at 162. The presumption of harm is warranted where a "comparative advertisement makes it obvious to the viewing public that the advertisement is targeted at the plaintiff, even though the plaintiff is not identified by name." *Procter & Gamble Co. v. Ultreo, Inc.* 574 F.Supp.2d 339, 346 (SDNY 2008) (citing *Time Warner*, 497 F.3d at 162).

Euro-Pro is an obvious competitor of Euroflex in the market for household steam cleaners. On numerous occasions in the Infomercial, Euroflex's spokespeople tout the

6

superiority of the Monster 1200 to "ordinary" or "regular" steam cleaners or mops, which are shown onscreen emitting steam and water in weak spurts. Infomercial at 6, 9. The Infomercial purports to dispel the "myth" and "industry deception" that "traditional steam cleaners" can "kill germs and sanitize." *Id*. at 1,3. Such references and comparative claims point, by clear implication, to Euro-Pro, acknowledged by Euroflex to be "the market-leader in portable household steam cleaners," and its products, which resemble those shown as examples of "ordinary steam cleaners."[4] Defs. Opp'n. Mem at 1. Based upon the comparative claims in the Infomercial, Euro-Pro has a reasonable basis for believing that literally false claims in the Infomercial will likely cause it injury.

### b. EPA Tested and Approved Claims

Plaintiff contends that the EPA Tested and Approved Claims are literally false because (1) the EPA does not test consumer products and (2) the EPA has not approved the Monster 1200, but merely approved the registration of the Clean Blast disinfectant as an antimicrobial pesticide regulated by the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. § 136-136y. Defendants counter that the Infomercial makes clear that the EPA Tested and Approved Claims apply only to the Clean Blast disinfectant solution.

The Clean Blast disinfectant is an antimicrobial pesticide regulated by FIFRA. *See* U.S.C. § 136(mm). To lawfully distribute a pesticide regulated by FIFRA, a seller must first "register" the product with the EPA. 7 U.S.C. § 136a. An applicant for registration must submit to the EPA all claims to be made for the pesticide as well as a description of the tests upon which such claims are based. *Id.* The EPA may only register a pesticide if it determines that it will not cause "unreasonable adverse effects on the environment." 7 U.S.C. 136a(c)(5).

However, "[t]he registration of a pesticide by the EPA is not a performance standard" and no provision of FIFRA requires a party seeking registration "to formulate its pesticide to an EPA-imposed composition." *Jeffers v. Wal-Mart Stores, Inc.* 171 F.Supp.2d 617, 623 - 624 (S.D. W.Va. 2001). The EPA does not independently test or study pesticides, but "depends upon the applicant to perform the tests, assemble the studies, and provide the data upon which EPA relies in registering the product and approving the label." *Id.* Moreover,

---

[4] In a declaration attached to Plaintiff's Reply Memorandum, a Euro-Pro executive states that based upon the allegedly false superiority claims in the Infomercial, buyers at retail stores have begun to question the quality of Euro-Pro's products and the veracity of its own product-efficacy claims. Mark Rosenzweig Decl. ¶ 13. Although such a declaration is far from dispositive, it reinforces the comparative nature of the Infomercial's claims.

7

"[t]he EPA's approval of a product's FIFRA label does not constitute a finding or an endorsement that its design is safe." *In re StarLink Corn Products Liability Litigation*, 212 F.Supp.2d 828, 837 (N.D.Ill. 2002).

The EPA approved registration of the Vital Oxide in August 2007, based in part on tests performed by ATS Laboratories that established the effectiveness of the antibacterial solution (the "ATS Tests"). Himes Decl. Ex. E; Dragovich Decl. ¶ 9. The approved product label states that Vital Oxide is a "Broad Spectrum Disinfectant Mold & Mildew Remover" that "Kills 99.9% of Bacteria." The instructions for use on the Vital Oxide label specify that to "Disinfect Hard Non-Porous Surfaces" the substance should be applied "full strength" to a pre-cleaned surface and allowed to "remain wet for 10 minutes." The approved product label also states that Vital Oxide is "HAZARDOUS TO HUMANS & DOMESTIC ANIMALS," that it "causes mild eye irritation," and that eye contact is to be avoided.

First, it is clear that the EPA does not test consumer products like the Monster 1200 or even pesticides like Vital Oxide. *See Jeffers*, 171 F.Supp.2d at 623 -624. Accordingly, claims that either the Monster 1200 or Clean Blast is "EPA Tested" are literally false.

Second, the "EPA Approved" claims are also literally false, notwithstanding the onscreen text that states "EPA approval applies to Clean Blast only." This Court has previously stated that a disclaimer or contradictory claim placed in an advertisement will not necessarily remedy an advertisement that is misleading per se where the disclaimer is in small text or difficult to read, as I find the qualifying language in the Infomercial to be. *Smithkline Beecham Consumer Health Care, L.P. v Johnson & Johnson-Merck Consumer Pharmaceuticals Company,* 906 F.Supp. 178, 182 (SDNY 1995) (Baer, J). In the context of the Infomercial, the EPA Approval Claims "necessarily imply a false message," *Time Warner*, 497 F.3d at 158, that the EPA has approved both the safety and the efficacy of Clean Blast when used in conjunction with the Monster 1200. For example, in the Infomercial, a Euroflex spokesperson states "And the great thing is, it's U.S. EPA tested and approved so you know it's safe," as the Monster 1200 is shown cleaning outdoor cooking equipment and the disclaimer "EPA approval applies to Clean Blast only" appears onscreen. In such context, the disclaimer cannot save the claim which necessarily implies the literally false claim that the EPA approved the safety and efficacy of the Monster 1200 with Clean Blast. Consequently, Defendants are enjoined, pending final determination of this action, from airing the

Infomercial, or replicating it in any other media, so long as the advertisement includes the EPA Tested and Approved language.

**c. Efficacy Claims**

With respect to the Efficacy Claims, the parties dispute whether the Infomercial's oft-repeated claim that the Monster 1200 "kills 99.99% of germs on contact" (i.e. almost instantly) is literally false. They also dispute the import and reliability of tests purported to prove or disprove the claim. In considering the literal falsity of the Efficacy Claims, I examine only the "kills 99.99% of germs" and "sanitizes on contact" claims because general claims that the product can "sanitize" are susceptible to more than one reasonable interpretation and thus cannot be literally false.[5] *Time Warner* Cable, 497 F.3d at 158.

### i. The Efficacy Claims are Establishment Claims

First I must determine whether the Efficacy Claims are establishment claims. The Infomercial's references to alleged EPA tests do not alone make the "Sanitizes on Contact" Claims into "tests prove" claims. The numerous Efficacy Claims are not expressly linked to the relatively few references to EPA tests. That is, the Infomercial never claims "EPA tests prove that the Monster 1200 sanitizes on contact," even if such a message is implied. Moreover, since the references to EPA tests must be excised from the Infomercial because they are literally false, I must consider whether the Efficacy Claims are establishment claims separate and apart from references to such tests.

In the context of the Infomercial, however, the Efficacy Claims are establishment claims, independent of any references to alleged EPA tests. First, at the outset of the Infomercial, Euroflex's spokesperson states "our engineers have put the Monster through hundreds of tests." Second, Euroflex's contention that its own scientific tests substantiate the Efficacy Claims is relevant to whether the Infomercial impliedly asserts "tests-prove" claims even if the such tests post-date the first airing of the infomercial; the relevant question is "whether the advertisement makes an assertion of test validation to the consumer public," *C.B. Fleet Co., Inc. v. SmithKline Beecham Consumer Healthcare, L.P.*, 131 F.3d 430,

---

[5] Reasonable consumers may disagree as to when "cleaning" capability crosses the line to become "sanitizing" capability. Thus, Efficacy Claims such as "truly sanitize your entire bathroom" cannot be deemed literally false and extrinsic evidence of actual consumer confusion is required to establish liability. *Time Warner* Cable, 497 F.3d at 158. That the term "sanitization" may have a specific meaning in the field of toxicology or for EPA-registered disinfectants is of no moment because consumers' interpretation of the term governs.

436 (4th Cir. 1997), not whether the advertiser in fact relied on the tests to make its claim. Moreover, the tests clearly pre-date the revised version of the Infomercial that I evaluate here.

Third and finally, in the full context of the Infomercial, the "Sanitizes on Contact" Claims are implied establishment claims because:  (1) the claims are made in conjunction with superiority claims such as "no other steam cleaner can do that"; (2) claims that the Monster 1200 can kill specific bacteria such as *mehticillin resistant staphyloccus aureus noroviris* necessarily imply a reliance on scientific testing; (3) the claims are made in conjunction with animated depictions or diagrams of the sanitizing process; and (4) the sanitizing capabilities of the Monster 1200 are asserted by a spokesperson in a white lab coat in a room identified by onscreen text as the "Euroflex Testing Lab."  *See Castrol*, 977 F.2d at 63; *Procter & Gamble*, 06 CV 34 (PAC), 2006 WL 2588002, *30 n.81 (SDNY 2006).  As the Second Circuit has acknowledged that establishment claims may be asserted by implication and that advertising claims must be evaluated in context, a plaintiff whose adversary relies upon scientific testing through innuendo must be allowed to establish the falsity of the challenged claims by showing the tests implicitly relied upon are unreliable, just as it would be permitted to do had the establishment claims been made expressly.  Alternatively, of course, such a plaintiff may adduce its own evidence of falsity.  Euro-Pro pursues both approaches here.

### ii. Reliability of Defendants' Tests

I next turn to the two tests that Euroflex contends substantiate its claim that the Monster 1200 "kills 99.99% of germs on contact."  The first test, conducted by researchers at the University of Padova in Italy,[6] tested the sanitizing capabilities of the Monster 1200 applied to contaminated tiles and textiles for five seconds at a distance of 5.9 inches (the "Padova Test").  Dragovic Decl. Ex. A.  The Padova Test concluded that under such conditions the Monster 1200 killed approximately 99.3% of E.coli and Staphylococcus bacteria.  *Id.*  The second test, conducted by Intertek Laboratories in Columbus, Ohio, concluded that the Monster 1200 reduced the presence of nine forms of bacteria on a linoleum sample by 99.9%, when the steam-plus-Clean-Blast solution was applied for two seconds

---

[6] Founded in the year 1222, the University of Padova (Universita degli Studi di Padova) is one of the oldest universities in Italy.  *See* Paul Grendler, *The Universities of the Italian Renaissance* 21 (Johns Hopkins University Press 2004).  The test was conducted by members of the Department of Environmental Medicine and Public Health, Center for Hygiene and signed off on by the director of that department as well as another professor.

10

from an unspecified distance (the "Intertek Test"). *Id.* at Ex. I. These tests are clearly designed to test the Efficacy Claims and thus the relevant issue is their reliability.

Euro-Pro's expert, Dr. Whittaker, criticizes both the Padova and Intertek Tests but her criticisms do not show the tests are so unreliable that they fail to establish the truth of the Efficacy Claims. Dr. Whittaker first opines that the Padova Test improperly used a standardized test protocol (ISO 22196) designed to evaluate an antibacterial agent's ability to inhibit the growth of bacteria on treated plastics as opposed to airborne bacteria. Reply Aff. and Expert Report of Margaret H. Whitaker, dated October 31, 2008 ("First Whittaker Report") at 4. Although a test that employs this protocol may not prove claims such as "sanitizes the air we breath," Dr. Whittaker does not show that use of the ISO 22196 protocol renders the Padova Test an improper measure of the efficacy of the Monster 1200 on hard surfaces such as those depicted in the Infomercial. Second, Dr. Whittaker criticizes the test distance of 5.9 inches as an inaccurate representation of the usage depicted in the Infomercial. *Id.* at 5-6. But in truth the Monster 1200 is shown in use from a variety of ranges, from less than two inches to more than one foot. Thus, testing the product's efficacy at a distance of approximately 6 inches is a reasonable approximation of the usage depicted in the Infomercial.

Third, Dr. Whittaker claims that the Padova Report omits underlying data relative to three important aspects of the test, but in each case the Padova Report states that the test component was complied with but simply omits the underlying data. *Id.* at 6-8. For example, from the report's omission of "positive and negative control data" Dr. Whittaker concludes that the "Padova study is not valid" and that the Efficacy Claims are "not substantiated."[7] *Id.* at 7. But the Padova Report expressly states that "positive and negative control tests have been prepared" and the ISO 22196 test protocol requires use of such controls. Dragovich Decl. Ex. A. Although a full exposition of the data underlying the test controls would arguably make the report more convincing, at this stage of the litigation I have no reason not to take the University of Padova professors at their word. Dr. Whittaker's criticism fails to establish that the test is unreliable.

---

[7] Positive test controls confirm that test results were not partly caused by qualities inherent to the contaminated test substance. Negative test controls confirm that laboratory conditions are not sources of contamination.

11

Dr. Whittaker levels substantially identical criticism at the Intertek Test. First Whittaker Report at 8-12. Such criticism points to deficiencies in the test report, not the test itself and are not enough for me to conclude that the test is so unreliable that it cannot reasonably support the Efficacy Claims.

### iii. Plaintiff's Test

After Euroflex had filed its opposition papers, Euro-Pro offered a report that summarizes a test of the Monster 1200 that it commissioned from BioScreen Testing Services Inc. Second Reply Aff. and Expert Report of Margaret H. Whittaker, dated November 7, 2008 ("Second Whittaker Report"), Ex. A. BioScreen tested the Monster 1200 by applying steam-plus-Clean-Blast to glass slides and cotton textiles contaminated with certain bacteria from a distance of 12 inches for two seconds, and concluded that the product did *not* kill 99.9% of bacteria under those conditions. *Id.* However, the BioScreen report does not state the percentage of bacteria that were in fact killed. It is thus conceivable that the Monster 1200 killed 99.8% of bacteria under the tested conditions and that an additional .1% of bacteria would have been killed had the steam been applied for one second longer. Defendants' expert Dr. Rodericks does not criticize the methodology of the Bioscreen test, but does note that it is unclear from the report how the results were calculated from the raw data. Rodericks Report at 7.

In summary, before the Court are two tests offered by Defendants that purport to prove that the Monster 1200 is capable of killing over 99% of bacteria under test conditions reasonably approximating some of the usage depicted on the Infomercial and one test offered by the Plaintiff that conclude the Monster 1200 cannot kill 99.99% of bacteria under slightly more rigorous test conditions, but without revealing the percentage of bacteria actually killed. Upon review of these submissions, I find that the Plaintiff has failed to either (1) establish that Defendants' tests are so unreliable that they cannot reasonably establish that the Monster 1200 is capable of "sanitizing on contact" or (2) meet its burden with affirmative evidence of the literal falsity of Defendants' Efficacy Claims.

I am compelled to note that, despite the nature of the products they market, neither party's hands are entirely clean. On the one hand, I am dubious that the "sanitizes on contact" claims do not overstate the celerity of the Monster 1200's sanitizing capabilities, and this claim must be subjected to further scrutiny at trial. On the other hand, Euro-Pro's delay in

12

offering any tests results of its own, weighs against exercise of this Court's equitable powers. At this juncture, with not much more than reports of tests that reach conflicting conclusions, I do not find that the "Sanitizes on Contact Claims" are literally false. Accordingly, Euro-Pro's motion to enjoin the Efficacy Claims is denied.

**c. Superiority Claims**

Euro-Pro has failed to establish that the Infomercial's Superiority Claims are literally false. First, where the Superiority Claims are asserted in conjunction with Efficacy Claims they are, by and large, paired with *general* claims of sanitizing capability (e.g. "you can truly sanitize your entire bathroom—no other steam cleaner in the world can make that claim"). *See, e.g.* Infomercial at 7. Because the term "sanitizes" is susceptible to more than one meaning, such Superiority Claims cannot be deemed false without affirmative evidence that other steam cleaners are in fact capable of "sanitizing" as the term is interpreted by the consumer public. Euro-Pro offers no such evidence.

Second, my foregoing finding that Plaintiffs have failed to show the literal falsity of the "Sanitizes on Contact" Claims, means that, without more, Plaintiff cannot establish the literal falsity of such Superiority Claims. Euro-Pro offers no evidence that other steam cleaners can "sanitize on contact." Accordingly, Euro-Pro's motion to enjoin the Superiority Claims is denied.

**d. Safety Claims**

Finally, Euro-Pro contends that claims that the Monster 1200, when used with the Clean Blast disinfectant, is "completely safe" and "harmless" are not only literally false, but also dangerous to the public. In support of this contention, Euro-Pro points to the label for Vital Oxide which cautions that the substance is "HAZARDOUS TO HUMANS & DOMESTIC ANIMALS," as well as the expert report of Defendant's own toxicologist, Dr. Rodericks, which summarizes the several product safety tests submitted to the EPA in connection with registration of Vital Oxide. In his report, Dr. Rodericks states that toxicity tests of Vital Oxide revealed the disinfectant caused mild eye and skin irritation in animals, but concludes that "prudent use of the Monster 1200 with Clean Blast should present relatively low risk to consumers." Rodericks Report at 7.

Euroflex argues, in essence, that although the Vital Oxide is *somewhat* hazardous, its low toxicity makes use of the solution in the Monster 1200 safe when both the steam cleaner

13

and the disinfectant are used as directed. Such reasoning, supported by Dr. Roderick's expert report, validates claims about the *relative* safety of the Monster 1200 (e.g. "it's a safe way to clean") but cannot substantiate *absolute* Safety Claims (e.g. "*completely* safe and harmless for children as well as pets") in the face of tests that show Vital Oxide to be an eye irritant.[8] Therefore, Euroflex is enjoined, pending final determination of this action from airing the Infomercial, or replicating it in any other media, until all claims that the Monster 1200 is "absolutely," "completely," or "entirely" safe have been removed.

**B. Motion to Dismiss Pier Milanese for Lack of Personal Jurisdiction**

Defendants move to dismiss the Complaint against Pier Milanese for lack of personal jurisdiction under Fed. R. Civ. Pro. 12(b)(2), because they contend he has no connection to the conduct at issue and no ties to New York.

In its Complaint, Euro-Pro alleges upon information and belief that, Pier Milanese is a "primary actor in the matters alleged [in the Complaint] by virtue of his control over and participation in the advertising and sales of the Monster Steamer" in New York. Compl. ¶ 13. Mr. Milanese directly contradicts such allegations in a sworn declaration in which he declares that he had no involvement in the advertising or marketing of the Monster 1200 in the United States. P. Milanese Decl. ¶¶1-10. Such services are performed by Euroflex Americas, a wholly-separate company in which he has no ownership and over which he has no control. *Id.* at ¶¶ 4-5. The allegations in Euro-Pro's complaint are supplemented only by a declaration of Euro-Pro executive Max Rosenzweig, who declares that he has visited the Milanese house for dinner, witnessed the "authority with which Pier Milanese controls his life, his family and his business," and on one occasion observed Andrea Milanese consult his father in the hospital before making a business decision. Max Rosenzweig Decl. ¶ ¶ 4-5.

The New York state long arm-statute governs the jurisdictional inquiry because the Lanham Act does not provide for national service of process. *Sunward Electronics, Inc. v. McDonald,* 362 F.3d 17, 22 (2d Cir. 2004). Of course, exercise of personal jurisdiction over a foreign defendant must also comport with constitutional principles of due process. *See, e.g., Agency Rent A Car System, Inc. v. Grand Rent A Car Corp.*, 98 F.3d 25, 32 (2d. Cir. 1996).

---

[8] I note that distinctions in the Infomercial between the "safe" Monster 1200 and "harmful chemical cleaners" are somewhat disingenuous since Vital Oxide is itself a chemical solution. I also note that the Infomercial's depiction of the Monster 1200 being sprayed casually overhead does not comport with responsible use of a product that uses a known eye irritant. Nevertheless, such claims and depictions are, at most, misleading and thus do not violate the Lanham Act without affirmative evidence of the views of actual consumers.

Although Plaintiff contends exercise of personal jurisdiction over Pier Milanese is permissible under three separate provisions of the New York long-arm statute, the question in each case turns on the contested fact of his role in the allegedly false advertising at issue. Thus, for example, this Court will have personal jurisdiction over Pier Milanese under NY CPLR §302(a)(1) if he is found to be a "primary actor in the transaction in New York that gave rise to the litigation," because upon such a finding the company's contacts with this district will be imputed to Pier Milanese under a theory of agency. *Karabu Corp. v. Gitner*, 16 F.Supp.2d 319, 323 -324 (SDNY 1998). Similarly, if Pier Milanese controlled and directed the allegedly false advertising to such an extent that he may be held individually liable under the Lanham Act, he might also be subject to personal jurisdiction in this court under the tortious-conduct provision of the New York long-arm statute, NY CPLR §§302(a)(2), notwithstanding the fact that he is not physically present in this district. *See Pilates, Inc. v. Pilates Institute, Inc*. 891 F.Supp. 175, 181 (SDNY 1995) (finding that corporate officer's physical presence in forum is not an essential ingredient for jurisdiction in Lanham Act case).

So too, will the constitutional inquiry into Pier Milanese's "minimum contacts with" and "purposeful availment" of this forum turn on the extent of his involvement with the marketing and advertising of the Monster 1200 in the United States. *See e.g., Asahi Metal Industry Co., Ltd. v. Superior Court of California*, 480 U.S. 102, 112, (1987) (noting that under a "stream of commerce" theory of jurisdiction a defendant's advertising or marketing of a product in the forum state may satisfy constitutional due process requirements).

At root, the question of jurisdiction turns on the truth of either the self-serving declaration of the Defendant himself or the Plaintiff's "information and belief" allegations supplemented by an equally self-serving declaration setting forth the observations of a Euro-Pro executive about the Milanese family dynamic. On such allegations, Plaintiff has alleged a *prima facie* case of personal jurisdiction but only barely. The Defendants possess documents and knowledge that bear on the jurisdictional question and discovery of them will either permit the Plaintiff to base its allegations on something more than self-serving speculation or establish that Pier Milanese truly is beyond the jurisdictional reach of this Court. Therefore, Defendant's motion to dismiss Pier Milanese is denied and Plaintiffs may conduct discovery

into the extent of Mr. Milanese's involvement with the U.S. advertising of the Monster 1200 for a thirty day period.

## CONCLUSION

For the foregoing reasons, Defendants are enjoined, pending final determination of this action, from asserting in connection with advertising the Monster 1200 that (1) the Monster 1200 is "EPA Tested and Approved" and (2) the Monster 1200 is "completely safe"; Plaintiff's Motion for Preliminary Injunction is denied in all other respects. Defendants' Motion to Dismiss the Complaint against Pier Antonio Milanese is denied. The parties are hereby will have thirty days for discovery on the jurisdictional issue and a total of sixty days for all discovery and the trial will commence in early March, 2009. Call my chambers for the date.

**IT IS SO ORDERED.**
**New York, New York**
**December $\underline{5}$, 2008**

_____
U.S.D.J.